# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **KRISTEN DEITER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:22-cv-00030** |
| | ) | |
| **TENNESSEE TECHNOLOGICAL** | ) | |
| **UNIVERSITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Kristen Deiter ("Dr. Deiter") works at Tennessee Technological University ("TTU") as an Associate Professor. She is suing TTU under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, <u>et seq.</u>, alleging employment sex discrimination when she was denied a promotion from Associate Professor to Full Professor. Now before the Court is TTU's Motion for Summary Judgment (Doc. No. 53), which has been fully briefed and is ripe for review (<u>see</u> Doc. Nos. 53, 54, 65, 69, 75). For the following reasons, TTU's motion will be denied.

## I.    BACKGROUND AND UNDISPUTED FACTS[1]

Dr. Deiter began working in the English Department at TTU on August 1, 2011. (Doc. No. 67 ¶¶ 1, 4). Dr. Deiter started working at TTU as an Assistant Professor, was promoted to an Associate Professor in August 2016, and attained tenure in 2017. (<u>Id.</u> ¶¶ 1–2). Dr. Deiter remains

---

[1] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. No. 67), the exhibits and depositions submitted in connection with the summary judgment briefing, and portions of the Amended Complaint (Doc. No. 13) that are not contradicted by the evidence in the record. Although the Court considered Doc. No. 70, TTU's reply to Dr. Deiter's response to TTU's statement of facts, it does not rely on it in this section because it is incomplete. (<u>See</u> Doc. No. 70 (containing 61 facts); Doc. No. 67 (containing 62 facts)).

a tenured Associate Professor of English at TTU today.  (Id. ¶ 3).  She applied for promotion from Associate Professor to Full Professor in Fall 2020.  (Id. ¶¶ 9, 22).  Her application was subject to two promotion policies: the English Department's tenure and promotion policy at the department level, and TTU Policy 206.  (Id. ¶ 23).

TTU Policy 206 provides high-level expectations for promotion, including the three factors considered in evaluating requests for promotion from Associate Professor to Full Professor: teaching, research and scholarship, and service/outreach.  (Doc. No. 67 ¶¶ 6, 8; Doc. No. 56-5 at 10–11).  TTU Policy 206 describes these three factors as flexible criterion, because "[a]ll full-time faculty members are expected to engage in teaching, research/scholarship/creative activity, and service/outreach, but not all are expected to engage in each activity to the same degree nor is each individual expected to be engaged in all aspects of each activity."  (Doc. No. 56-5 at 10).  At the time of Dr. Deiter's application for promotion, neither the English Department promotion criteria, nor the TTU Policy 206 criteria, required an Associate Professor to publish a specific number of articles in refereed or peer-reviewed journals to be eligible for promotion with respect to the research and scholarship factor.  (Doc. No. 68-3 at 17:9–21; Doc. No. 68-4).[2]

TTU Policy 206 also describes the process of evaluation:

> Because individual priorities, workloads, the level and quality of support services and facilities, disciplinary characteristics, and faculty capabilities and interests are all subject to wide variation within Tennessee Tech, an effective system for evaluating potential or performance must be based upon the professional judgment of the faculty members in the candidate's academic department/unit.

---

[2] The current English Department's promotion criteria requires an Associate Professor to have written two publications in refereed or peer-reviewed journals, or a book, to satisfy the research and scholarship factor for promotion from Associate Professor to Full Professor.  (See Doc. No. 68-3 at 18:8–15; Doc. No. 68-5).

The departmental/unit peers have the primary responsibility for evaluating the quality of faculty performance relative to appointment to or promotion in academic rank.

(Doc. No. 13 ¶ 16). Accordingly, when an Associate Professor applies for promotion to Full Professor, the faculty member's application ("dossier") is reviewed by department peers (including a committee chair), the Department Chair, the Dean of the College for the department the faculty member belongs to, the Provost, Dr. Lori Mann Bruce, and the President of TTU, Dr. Philip Oldham. (Doc. No. 13 ¶¶ 14, 18; Doc. No. 67 ¶ 11). The Provost is responsible for reviewing the evaluations and recommendations of the peers, chairs, and department dean. (Doc. No. 56-10 at 2).

Upon review, the Provost provides the President with her recommendation on promotion. (Doc. No. 67 ¶ 30). TTU Provost Guidelines for Promotion Procedures and Forms provide the following guidance regarding the Provost's review of a faculty member's dossier and corresponding recommendations:

If the Vice President for Academic Affairs disagrees with the recommendation as expressed in the vote of the unit peers, he/she shall write a letter to the unit peers explaining the reason(s) for his/her disagreement. He/she shall also forward a copy of the letter to the candidate for promotion, to the unit chairperson, to the administrator to whom the faculty member immediately reports, if this is not the chairperson, and to the dean, and he/she shall include a copy of the letter in the promotion dossier.

(Doc. No. 13 ¶ 17). The President makes the final decision on whether a faculty member will be promoted.[3] (Doc. No. 67 ¶ 13). The President, in reviewing the faculty member's dossier and

---

[3] Although the parties seem to dispute whether the President has final decision-making authority on all requests for promotion (see Doc. No. 67 ¶ 13), there is no dispute that President Oldham had the final decision-making authority with respect to Dr. Deiter's application for promotion. (Id.; Doc. No. 68-9 at 47; Doc. No. 70-1 ¶ 9).

3

corresponding recommendations, does not speak with the faculty member seeking promotion, nor does he speak with any reviewer other than the Provost. (Doc. No. 67 ¶ 16).

TTU Policy 206 also provides for an appeals procedure if an applicant is dissatisfied with the promotion decision:

> Should a faculty member be dissatisfied with the decision respecting his/her promotion at any point in the promotion process, up to, but not including the recommendation of the President to the Board, he/she may appeal that decision through the Faculty Affairs Committee. The Faculty Affairs Committee shall issue a written recommendation to the President, who will make a decision about the matter. The President's decision will be final.[4]

(Doc. No. 68-9 at 1). The President can accept or reject the Faculty Affairs Committee's recommendation with respect to promotion. (Doc. No. 67 ¶ 21).

Dr. Deiter applied for the position of Full Professor, based on her work over the prior five years as an Associate Professor. (Doc. No. 68-2). The English Department conducted its review of Dr. Deiter's dossier in Fall 2020. (Doc. No. 67 ¶ 26). On November 11, 2020, Dr. Deiter's peers in the English Department voted six to two to recommend Dr. Deiter for promotion. (Id.). On December 21, 2020, Dr. Deiter's Interim Department Chair, Dr. Linda Null, recommended her for promotion to Dean Paul Semmes, the Dean of the College of Arts and Sciences. (Id. ¶ 28; Doc.

---

[4] The parties dispute whether this procedure constitutes filing a "grievance" or an "appeal" with the Faculty Affairs Committee. (See Doc. No. 67 ¶¶ 20, 41). There is conflicting evidence in the record as whether "grievance" or "appeal" is the correct term of use here. (See, e.g., Doc. No. 56-3 at 72:9–12 (President Oldham testifying that the Faculty Affairs Committee "manage that appeals review and then forward a recommendation on to" the President, "based on their evaluation of the case."); Doc. No. 68-9 at 1 (TTU Policy 206 Section VIII.F, referring to process as an "appeal"); Doc. No. 68-10 at 1 (Interim Chair of the Faculty Affairs Committee referring to Dr. Deiter's filing as an "appeal" "regarding denial of promotion"); but see Doc. No. 56-11 (President Oldham referring to Dr. Deiter's letter to the Faculty Affairs Committee as a "grievance"); Doc. No. 68-10 at 2 (the Faculty Affairs Committee determining a valid "[g]rievance" existed). Whether this process constitutes a "grievance" or "appeal" has no import to the outcome of this motion. The Court will therefore refer to this action as an appeal process for the purposes of discussion here.

4

No. 13 ¶¶ 12–13).  On May 20, 2021, Dean Semmes recommended Dr. Deiter for promotion to Provost Lori Mann Bruce.  (Doc. No. 67 ¶ 29).  In their recommendations for promotion, both Dr. Null and Dr. Semmes described Dr. Deiter as "internationally known" for her research.  (Doc. No. 56-6 at 2; Doc. No. 56-7 at 1).  However, on May 25, 2021, Provost Bruce recommended to President Oldham that Dr. Deiter not be promoted.  (Doc. No. 67 ¶ 30).  Provost Bruce memorialized her recommendation that Dr. Deiter not be promoted in a letter to President Oldham. (Doc. No. 68-13)  Provost Bruce wrote that based on her review of Dr. Deiter's dossier, it was her "assessment that there is not adequate documented evidence to satisfy th[e TTU Policy 206] criteria."  (Id. at 1).

President Oldham then reviewed Dr. Deiter's application.  He believed Dr. Deiter met his expectations for promotion in the service and outreach category, and that her teaching was sufficient for promotion.  (Doc. No. 67 ¶ 39).  However, he was concerned about the quantity and frequency of her scholarship, and discussed this with Provost Bruce.  (Id. ¶¶ 33, 37).  At the time of Dr. Deiter's request for promotion, she had written two scholarly articles that were published in peer-reviewed publications, and a book review, over the five-year consideration period.[5]  (Doc. Nos. 68-2, 68-15, 68-16).  She also had received the Scholar-Mentor award as an Associate Professor and served on the TTU research advisory committee.  (Doc. Nos. 68-20, 68-6).  Still,

---

[5] TTU briefly argues that one of the two scholarly articles may not have qualified for consideration for Dr. Deiter's application for Full Professor because some of the work on it may have been done while Dr. Deiter was still an Assistant Professor.  (Doc. No. 54 at 17).  However, there does not appear to be a genuine dispute of fact that President Oldham considered both articles in reviewing her application.  The vast majority of TTU's briefing refers to and cites to evidence describing Dr. Deiter's "two" scholarly articles considered in her dossier, including TTU's own Statement of Undisputed Facts.  (See Doc. No. 54 at 5, 17; Doc. Nos. 67, 70 at ¶ 38; Doc. No. 69 at 5).  Given this, and that TTU does not go so far as to say one of Dr. Deiter's scholarly works was not considered during the review process, the Court considers both articles as part of Dr. Deiter's dossier.

5

on May 25, 2021, President Oldham wrote a letter to Dr. Deiter regarding her promotion request, stating:

> I have reviewed your dossier and the recommendations of your peers, chair, dean, and provost. I am not in agreement with the recommendations of your peers, chair and dean. I concur with the provost that the promotion of Professor not be granted.

(Doc. No. 56-9 at 2).

On June 15, 2021, Dr. Deiter filed an appeal with the Faculty Affairs Committee, requesting that it "recommend that President Oldham overturn the Provost's negative recommendation." (Doc. No. 68-9 at 1, 47). On August 20, 2021, the Faculty Affairs Committee wrote President Oldham a letter regarding Dr. Deiter's appeal. (Doc. No. 68-10 at 1). In it, Dr. Sandi Smith-Andrews, the Interim Chair of the Faculty Affairs Committee, informed President Oldham of the Provost's procedural errors in her review of Dr. Deiter's dossier:

> The Provost's recommendation letter provided to the complainant and the requested documentation by the Faculty Affairs Committee do not contain justifiable reasons for her disagreement with the prior [affirmative] recommendation. The letter simply stated, "it is my assessment that there is not adequate documented evidence to satisfy these criteria." The Provost also made general recommendations to Dr. Deiter to improve the dimensions of teaching, scholarship, and collegiality but without clarity on any of the issues.

> The committee found that the recommendations aligned more with individual comments made by the minority dissenters of the unit peers and not those of the majority, as documented in the Summary of Promotion Vote. No other explanation was provided to justify how the prior recommendations were in error, as implied by the rejection. This explanation is an implicit requirement in the Promotion Policy (206) and an explicit requirement of the promotion procedures. The letter provided by the Provost to the committee did not satisfy the expectation or requirement. Further, the committee found no evidence the unit peers were notified of the reasoning for overturning their recommendation as required in the promotion procedures. The Faculty Affairs Committee found the Provost did not provide justifiable reasons for rejecting the recommendations of the dean, chair, and peers.

6

(Id. at 2) (emphasis added). The letter concluded stating that the "Faculty Affairs Committee unanimously voted to recommend that the Provost's denial [be] overturned, and Dr. Deiter [be] promoted to Professor." (Id.).

On September 16, 2021, President Oldham rejected the recommendation from the Faculty Affairs Committee that Dr. Deiter be promoted, stating:

> Dr. Kristen Deiter was denied promotion at the end of the 2020-21 academic year. Dr. Deiter then filed a letter of grievance with the Faculty Affairs Committee. Following a review documentation, the Faculty Affairs Committee voted to overrule the promotion decision.
>
> That recommendation was sent to me for a final decision. I have reviewed the original letter of the Provost, the report of the Faculty Affairs Committee, and the dossier of Dr. Deiter. After careful consideration of all documentation and supporting input, I find that although the record is strong in other aspects that the current level of peer reviewed published scholarship is insufficient for promotion to professor at this time.

(Doc. No. 56-11 at 2) (emphasis added).

On April 1, 2022, Dr. Deiter filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination on the basis of sex when she was denied a promotion to a Full Professor position. (Doc. No. 67 ¶¶ 43–44). Dr. Deiter believes she experienced discrimination because two men with fewer achievements than she, Dr. Brian Williams and Dr. Mark Loftis, were promoted. (Id. ¶¶ 45, 48).

Dr. Williams applied for promotion in the English Department in the fall semester of 2021 and was promoted from Associate to Full Professor in the spring of 2022. (Id. ¶ 49). Four out of seven of Dr. Williams's peers in the English Department supported by his application for promotion. (Id. ¶ 51). The Interim Chair of the English Department, Dr. Null, the Dean, Dr. Jeff Roberts, and Provost Bruce also supported his application for promotion. (Id.). Dr. Williams had one published peer reviewed work, and one work accepted for publication, included in his dossier

for consideration at the time he applied for promotion. (Doc. No. 56-3 at 106:15–18; Doc. No. 57-2 at 33:25–34:6). President Oldham recommended Dr. Williams be promoted, finding his publication record substantial enough in light of the rest of his dossier. (Doc. No. 56-3 at 109:7–14).

Dr. Loftis applied for promotion in the fall semester of 2021 and was promoted from Associate to Full Professor in the spring of 2022 in the Department of Counseling and Psychology. (Doc. No. 67 ¶ 50). All of Dr. Loftis's peers in his department supported his application for promotion. (Id. ¶ 53). His Interim Chair of Counseling and Psychology Department, Dr. Stephanie Kazanas, and the Dean of the College of Education also supported his application. (Id.) However, Provost Bruce did not. (Id.). Provost Bruce recommended Dr. Loftis not be promoted, explaining he needed to teach more undergraduate courses and improve his scholarship. (Id. ¶ 59). Dr. Loftis had only one published article in his dossier at the time he was up for promotion. (Doc. No. 56-3 at 98:13–18; Doc. No. 59-5 at 31:1–32:20). However, President Oldham ultimately recommended Dr. Loftis for promotion in June 2022, as he found Dr. Loftis's publication work sufficient in light of the total strength of his dossier. (Id. ¶ 61; Doc. No. 56-3 at 109:5–17).

The EEOC issued Dr. Deiter a right-to-sue letter on April 26, 2022. (Doc. No. 67 ¶ 46). Dr. Deiter filed suit against TTU on July 5, 2022. (Id. ¶ 47). TTU has now moved for summary judgment. (Doc. No. 53).

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)). "The party bringing the summary

8

judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. Rodgers, 344 F.3d at 595.

III. **ANALYSIS**

TTU argues summary judgment is appropriate on two grounds: (1) Dr. Deiter has failed to exhaust her administrative remedies; and (2) TTU is entitled to summary judgment on the merits. (Doc. No. 56 at 9, 11, 22). The Court will address each issue in turn.

1. <u>Exhaustion of Administrative Remedies</u>

TTU's first argument for summary judgment rests on Dr. Deiter's purported failure to exhaust her administrative remedies for her Title VII claim. "Title VII enforcement relies on a combination of public and private action and mandates that the EEOC, the federal agency tasked with enforcing Title VII, must afford non-compliant employers the chance to voluntarily cure their violations before Title VII litigation may be brought against them." <u>Logan v. MGM Grand Detroit Casino</u>, 939 F.3d 824, 827 (6th Cir. 2019). "Consequently, a protected individual may not simply sue a recalcitrant employer under Title VII without having first brought the dispute before the EEOC for resolution." <u>Id.</u>

"It is well settled that a plaintiff must satisfy two prerequisites before filing a Title VII action in federal court: (1) timely file a charge of employment discrimination with the EEOC; and (2) receive and act upon the EEOC's statutory notice of the right to sue ('right-to-sue letter')." <u>Granderson v. Univ. of Michigan</u>, 211 F. App'x 398, 400 (6th Cir. 2006) (internal citations omitted). In a "deferral state" such as Tennessee, the plaintiff's charge may be filed with the Tennessee Human Rights Commission ("Commission") or the EEOC "within [300] days after the alleged unlawful practice occurred." 42 U.S.C. § 2000e–5(e). "The 300-day time period begins to run when the employee is notified of the alleged discriminatory act." <u>Caruso v. Alltel Corp.</u>, 113 F. App'x 90, 91 (6th Cir. 2004) (citing <u>Amini v. Oberlin Coll.</u>, 259 F.3d 493, 498–500 (6th Cir. 2001)); <u>see</u> <u>EEOC v. United Parcel Serv., Inc.</u>, 249 F.3d 557, 561–62 (6th Cir. 2001) (The limitations period in 42 U.S.C. 2000e-5(e)(1) "does not begin to run. . . until an employer makes and communicates a final decision to the employee.") (citing <u>Del. State Coll. v. Ricks</u>, 449 U.S. 250, 258 (1980)). "The proper exhaustion of administrative remedies" through timely filing a charge with the EEOC and receiving a right-to-sue letter "gives the Title VII plaintiff a green light

to bring an employment-discrimination claim in court." Granderson, 211 F. App'x at 400. Upon receipt of the right-to-sue letter, a plaintiff has 90 days to file suit in federal district court. 42 U.S.C. § 2000e–5(e). These EEOC filing requirements are "subject to waiver, estoppel, and equitable tolling." Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982); see Truitt v. County of Wayne, 148 F.3d 644, 646–47 (6th Cir. 1998) (90-day filing requirement is a timing requirement "similar to a statute of limitations, subject to waiver, estoppel and equitable tolling").

TTU contends Dr. Deiter did not properly exhaust her remedies with the EEOC before filing suit. TTU asserts that Dr. Deiter received notification from President Oldham on May 25, 2021 that she was not selected for promotion, starting the clock on her 300-day window to file with the EEOC or Commission. (Doc. No. 54 at 10). TTU maintains that because Dr. Deiter did not file suit until April 1, 2022, more than 300 days after May 25, 2021, and tolling and continuing violation doctrines do not apply here, she failed to satisfy the first requirement for exhaustion and her case is barred. (Id. at 10–11). Dr. Deiter contends that TTU's exhaustion argument fails for three reasons: (1) TTU waived this affirmative defense by admitting Dr. Deiter filed a timely complaint with the EEOC; (2) the final decision was not issued on May 25, 2021, but rather on September 16, 2021, when President Oldham rejected the Faculty Affairs Committee's recommendation to promote Dr. Deiter; and (3) even if the final decision was on May 25, 2021, the clock did not start running until Dr. Deiter became aware of the decision on June 7, 2021. (Doc. No. 65 at 10–12).

The Court agrees with Dr. Deiter that TTU has waived its affirmative defense that Dr. Deiter did not comply with the EEOC filing requirement. TTU waived this defense when it admitted Dr. Deiter "filed a timely complaint of sex discrimination against TTU" with the EEOC in its Answer to the Amended Complaint (Doc. No. 15 ¶ 28). See Zipes, 455 U.S. at 393 (a timely

charge with the EEOC is subject to waiver); see also Thompson v. Heiner's Bakery, 2012 WL 1835709, at *4 n.12 (W.D. Va. May 18, 2012) (defendant waived untimeliness argument when she admitted that plaintiff timely filed a charge with the EEOC); Fields v. Coca-Cola Bottling Co. of Mid-America, Inc., 1991 WL 241834, at *1–2 (D. Kan. Oct. 31, 1991) (defendants waived EEOC timely filing affirmative defense when they admitted all conditions precedent to filing suit, including EEOC requirements, had been met); EEOC v. Mico Oil Co., Inc., 1988 WL 130660, at *1 (D. Kan. Nov. 21, 1988) ("By admitting that all conditions precedent had been met, the defendants waived any affirmative defense based on the untimeliness of [the plaintiff] filing her charge with the EEOC.").

TTU asserts it only admitted Dr. Deiter filed a timely complaint because her EEOC charge referenced the September 2021 decision date. (Doc. No. 69 at 1). It contends discovery has revealed that President Oldham's decision not to promote Dr. Deiter on May 25, 2021 is actually the operative date of discrimination, and it has not admitted any timely filing with respect to that event. (Doc. No. 69 at 2–3). However, this late-stage argument is not convincing such that it may overcome TTU's clear prior waiver, particularly given that: (1) the Amended Complaint does not reference a particular date with respect to the timeliness of Dr. Deiter's EEOC complaint; (2) the May 25, 2021 date is referenced various times in the Amended Complaint, putting TTU on notice as to its relevance in this case; and (3) Dr. Deiter maintains the operative date of the adverse employment action is September 16, 2021. (Doc. No. ¶ 13; Doc. No. 65 at 11).

TTU's inaction on this issue supports a finding of waiver. For instance, TTU did not plead in its Answer an affirmative defense of untimeliness or failure to exhaust EEOC requirements. (Doc. No. 15 at 5–6). Despite having more than eight months between filing its Answer and the deadline to amend pleadings (Doc. Nos. 15, 20), TTU never moved for leave to amend its Answer

12

to add this defense or to deny that Dr. Deiter's EEOC filing was untimely.  To date, TTU still has not taken any such action.  This failure also constitutes a waiver of the EEOC filing requirements.  Wood v. Milyard, 566 U.S. 463, 470 (2012) ("An affirmative defense, once forfeited, is 'exclu[ded] from the case[.]' ") (citing 5 C. Wright A. Miller, Federal Practice and Procedure § 1278 at 644–45 (3d ed. 2004)).  Ultimately, TTU never questioned the validity of this suit until it filed its motion on June 28, 2024, more than two years after the Complaint was filed.  (Doc. Nos. 1, 53).  While the Court need not decide this issue here, TTU's failure to timely object to the filing of this suit prior to filing the instant motion itself may have *also* constituted a waiver of its affirmative defense that Dr. Deiter did not satisfy the EEOC filing requirement.  See Baughey v. Tecumseh Country Club, Inc., 1 F.3d 1240 (6th Cir. 1993) (table) (plaintiffs' failure to timely object to removal of the claim to federal court until five days before oral argument on appeal constituted waiver).  Accordingly, the Court finds TTU waived any argument as to Dr. Deiter's failure to exhaust.  Zipes, 455 U.S. at 393.  Because TTU has waived its argument here, the Court need not address the parties' other arguments as to the timeliness of Dr. Deiter's EEOC filing.

   2. Summary Judgment on the Merits

   TTU next argues that it is entitled to summary judgment on the merits because Dr. Deiter failed to establish a prima facie case or pretext.  The analytical framework for employment discrimination claims is well known.  In the absence of direct evidence of discrimination (and there is none here), a plaintiff can survive summary judgment by establishing discrimination through indirect or circumstantial evidence under the burden shifting paradigm set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), as refined by Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981).  "Under this framework, the plaintiff must first make out a *prima facie* case of [sex] discrimination[.]"  Rogers v. Henry Ford Health Sys., 897 F.3d 763, 772 (6th

13

Cir. 2018). "Then, 'the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision.'" Id. (quoting Upshaw v. Ford Motor Co., 576 F.3d 576, 584 (6th Cir. 2009)). "If the employer does so, 'the plaintiff must then prove by a preponderance of the evidence that the reasons offered by the employer were pretextual.'" Upshaw, 576 F.3d at 584.

A. Prima Facie Case

To establish a prima facie case of discrimination under Title VII in the failure-to-promote context, Dr. Deiter must show that: "(1) she is a member of a protected class; (2) she was qualified for promotion; (3) she was 'considered for and denied the promotion'; and (4) 'other employees of similar qualification who were not members of the protected class received promotions.'" Upshaw, 576 F.3d at 585 (quoting Grizzel v. City of Columbus Div. of Police, 461 F.3d 711, 719 (6th Cir. 2006) (internal citation omitted)). TTU concedes that Dr. Deiter satisfied the first and third prongs of her prima facie case, but she has "failed to admit evidence in the record to demonstrate the second and fourth prongs[.]" (Doc. No. 54 at 12). The Court finds that, looking at the facts in the light most favorable to Dr. Deiter, she has carried her burden on the second and fourth prongs of her prima facie case.

a. Second Prong

To establish the second prong, that she was qualified for the position of Full Professor, Dr. Deiter need only show that she satisfied TTU's "objective" qualifications. Upshaw, 576 F.3d at 585 (citing Wexler v. White's Fine Furniture, Inc., 317 F.3d 564, 575–76 (6th Cir. 2003) (en banc)). The undisputed evidence in the record shows that: (1) the criteria for promotion included teaching, research and scholarship, and service/outreach (Doc. No. 67 ¶ 8; Doc. No. 56-5 at 10–11); (2) faculty members need not engage in each activity to the same degree, "nor is each individual expected to be engaged in all aspects of each activity" (Doc. No. 56-5 at 10); and (3)

14

President Oldham admitted Dr. Deiter's record for the first and third criteria, teaching and service, met expectations and were sufficient for promotion (Doc. No. 67 ¶ 39). Further, TTU concedes Dr. Deiter was objectively qualified in the teaching and service/outreach categories. (Doc. No. 54 at 12–13 (arguing Dr. Deiter was unqualified only due to her scholarship record)).

TTU's sole argument that Dr. Deiter has not established she was qualified for promotion is that she "did not meet the expectation of 'documented evidence of sustained high quality professional productivity' of scholarly output" during her time as an Associate Professor. (Doc. No. 54 at 12–13 (internal citation omitted)). As an initial matter, it is not evident that the Court may even consider TTU's argument, given it relies solely on its purported legitimate non-discriminatory reason for denying Dr. Deiter's request for promotion. Wexler, 317 F.3d at 574 ("[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case."). However, even if the Court were to consider TTU's argument, Dr. Deiter has still carried her burden of showing she was objectively qualified for promotion. TTU has provided insufficient proof for the Court to conclude, as a matter of law, that Dr. Deiter was unqualified because of her publication record. Wexler, 317 F.3d at 575 (district court erred in holding plaintiff did not establish a prima facie case where there was insufficient proof in the record to conclude plaintiff was unqualified as a matter of law).

TTU Policy 206 provides that the research and scholarship factor may consider various activities: pure research, applied research, pedagogical research, artistic creativity and performance, and faculty development. (Doc. No. 56-6 at 10). At the time Dr. Deiter applied for promotion to Full Professor, neither the English Department nor the TTU Policy 206 had established a publication quota for satisfying the scholarship portion of this factor. (Doc. No. 68-

3 at 17:9–21; Doc. Nos. 68-4).  Dr. Deiter has presented evidence that her promotion materials contained two publications in peer-reviewed journals and a book review, demonstrating her scholarship.[6]  (Doc. Nos. 68-2, 68-15, 68-16).  She also has shown she had received the Scholar-Mentor award as an Associate Professor and served on the TTU research advisory committee, showing her research accolades.  (Doc. Nos. 68-20, 68-6).  Further, Dr. Deiter has presented evidence showing her Interim Department Chair, Dr. Null, and Dean Semmes said she is "internationally known" for her research.  (Doc. Nos. 56-6 at 2, 56-7 at 1).  TTU does not dispute these facts, much less present any convincing evidence countering the assertion that these facts establish Dr. Deiter's objective research and scholarship qualifications.  (Doc. No. 54 at 12–13; Doc. No. 69 at 4).  These accolades, taken together, establish that Dr. Deiter had the objective qualification of sufficient research and scholarship for promotion to Full Professor.  Upshaw, 576 F.3d at 585.  Accordingly, viewing the facts in the light most favorable to Dr. Deiter, she has established she was objectively qualified for the role of Full Professor.  Id.; see Vessels v. Atlanta Indep. Sch. Sys., 408 F.3d 763, 769 (11th Cir. 2005).

a.  Fourth Prong

The fourth element of the McDonnel Douglas test—that a plaintiff must show that a similarly-situated individual outside her protected class was promoted—is satisfied here.  See e.g., Johnson v. Univ. of Cincinnati, 215 F.3d 561, 572–73 (6th Cir. 2000) (citing McDonnell Douglas, 411 U.S. at 802); see also Provenzano v. LCI Holdings, Inc., 663 F.3d 806, 814 (6th Cir. 2011).  To satisfy this prong, the Sixth Circuit has held that Dr. Deiter must show:

---

[6] Notably, this evidence suggests that Dr. Deiter would have satisfied the current English Department quota for publication, had it applied to her.  (Doc. No. 68-5 at 17:10–17).  Viewing the facts in the light most favorable to Dr. Deiter, this supports a finding Dr. Deiter has established she had the objective scholarship qualifications for promotion.

16

that the "comparables" are substantially similar *in all respects*. ... Thus to be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.

Gray v. Toshiba America Consumer Products, Inc., 263 F.3d 595, 599 (6th Cir. 2001) (quoting

Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992) (internal citation omitted)); see White

v. Columbus Metropolitan Housing Authority, 429 F.3d 232, 243 (6th Cir. 2005) ("[I]n order to

satisfy the fourth prong of the *prima facie* burden in a failure to promote case, it is incumbent upon

the plaintiff to establish that she and the non-protected person who ultimately was hired for the

desired position had similar qualifications.").

TTU argues Dr. Deiter cannot establish either that: (1) Dr. Loftis or Dr. Williams were

outside of the protected class; or (2) they are similarly situated to her. TTU's first argument falls

short. (Doc. No. 54 at 13). Drawing all justifiable inferences in Dr. Deiter's favor, as the Court is

required to do here, Matsushita, 475 U.S. at 587, Dr. Deiter's proffered evidence that she, President

Oldham, and Provost Bruce all identified Dr. Loftis and Dr. Williams as male in their depositions

is sufficient to establish they are both men and not part of Dr. Deiter's protected class, women.

(Doc. No. 68-1 at 10:16–22; Doc. No. 68-12 at 33:17–21; Doc. No. 56-3 at 95:6–21, 97:11–15).

That both Dr. Loftis and Dr. Williams are male is consistent with all other evidence in the record.

TTU's second argument, that the record does not support that Dr. Loftis and Dr. Williams

are similarly situated to Dr. Deiter, is no more successful. The parties have raised various

arguments as to what "similarly situated" means in this context. (Doc. No. 54 at 13–15; Doc. No.

65 at 16–19). However, for the purposes of summary judgment, Dr. Deiter presented sufficient

admissible evidence to establish that she was similarly situated to Dr. Loftis or Dr. Williams in all

relevant respects. Dr. Deiter was similarly situated to Dr. Williams because they both sought Full

17

Professor positions during 2021, both were a part of the English Department, both were subject to TTU Policy 206, and President Oldham was the ultimate decisionmaker of their applications for promotion. (Doc. No. 67 ¶¶ 26, 49; Doc. No. 56-3 at 109:7–14; Doc. No. 56-9 at 2). Further, Dr. Deiter and Dr. Williams both obtained majority, but not unanimous, support from their peers for promotion and had support from their department chair and deans. (Doc. No. 67 ¶¶ 26, 28–29, 51). And President Oldham found their dossiers strong in the teaching and service categories, but weak in scholarship because they both had two peer-reviewed articles published or approved for publishing at the time of their requested promotions. (Doc. No. 65 at 18; Doc. No. 56-3 at 106:15–18; Doc. No. 57-2 at 33:25–34:6; Doc. Nos. 68-2, 68-15, 68-16). These undisputed facts show Dr. Deiter and Dr. Williams were substantially similar in all relevant ways. Gray, 263 F.3d at 599 (comparables are substantially similar if they dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct).

TTU contends these similarities are not enough because (1) Dr. Deiter and Dr. Williams had different deans reviewing their applications; and (2) unlike Dr. Deiter's application, Dr. Williams's application did not get to President Oldham as a "split vote" because all lower levels of review recommended his promotion, resulting in President Oldham using a different evaluation process than that used for Dr. Deiter. (Doc. No. 54 at 13–15). The Court takes TTU's point that Dr. Deiter's and Dr. Williams's promotion applications were reviewed by different deans. (Doc. No. 54 at 14). However, this difference is meaningless because Dr. Deiter's and Dr. Williams's respective deans each recommended they be promoted, showing similar outcomes at that stage of the review process. (Doc. No. 67 ¶¶ 26, 28–29, 51). That Dr. Deiter and Dr. Williams shared the "same ultimate decision-maker[,]" President Oldham, demonstrates this difference is insignificant. Goldblum v. Univ. of Cincinnati, 62 F.4th 244, 255 n.3 (6th Cir. 2023) ("[R]equiring comparators

to have the 'same supervisor' may be better understood as requiring comparators to have 'dealt with the same ultimate decision-maker.") (quoting <u>McMillan v. Castro</u>, 405 F.3d 404, 414 (6th Cir. 2005)).

TTU's argument that President Oldham conducted different review processes for Dr. Williams's and Dr. Deiter's promotion applications fares no better. Dr. Deiter cites to testimony from President Oldham calling into question what constitutes "unanimous" and "split" support at the lower level review such that the import of President Oldham's differing review processes is a dispute of fact best resolved at trial.[7] (<u>See</u> Doc. No. 65 (citing Doc. No. 56-3 at 104:14–19 (President Oldham noting the ambiguity in Dr. Deiter's application started with the minority comments from her department)). Ultimately, neither of these arguments overcomes the evidence Dr. Deiter has presented demonstrating the substantial similarities between Dr. Williams and herself. Accordingly, viewing the facts in Dr. Deiter's favor, the Court finds she has satisfied her burden of establishing Dr. Williams, a male, was similarly situated to her and was promoted. <u>Johnson</u>, 215 F.3d at 572–73.

Whether Dr. Loftis and Dr. Deiter are similarly situated is a closer call. Still, Dr. Deiter points to sufficient evidence to create a genuine dispute of fact on whether she was similarly situated to Dr. Loftis. It is undisputed that Dr. Loftis and Dr. Deiter belong to separate colleges within TTU, work under different deans, and were subject, to some degree, to different department

---

[7] The parties provide extensive briefing on President Oldham's differing review processes based on whether a faculty member seeking promotion had a "split vote" or "unanimous vote" at lower levels of promotion review. (<u>See</u> Doc. No. 54 at 14; Doc. No. 65 at 19; Doc. No. 75 at 12; Doc. No. 70-1). The parties have presented conflicting evidence from President Oldham's own testimony as to what sorts of negative recommendations may constitute a "split vote," including a lengthy declaration from President Oldham that was introduced for the first time in TTU's reply briefing. <u>See</u> Doc. No. 70-1. Accordingly, President Oldham's review process will not be considered undisputed in resolving this motion; this issue is best resolved by the jury at trial.

level promotion criteria (in that Dr. Loftis was not subject to any and Dr. Deiter was). (Doc. No. 54 at 13; Doc. No. 59-4 at 18:9–12, 28:23–25; Doc. No. 68-3 at 24:4–25:24). However, Dr. Deiter presents relevant evidence showing she and Dr. Loftis were similarly situated: both were seeking promotion to Full Professor during 2021; both applications were subject to TTU Policy 206; and both applications were finally reviewed by President Oldham. (Doc. No. 67 ¶¶ 39, 50, 61; Doc. No. 68-2; Doc. No. 56-3 at 109:5–17). While Dr. Loftis had support from all of his peers, and Dr. Deiter had only a majority support, Provost Bruce recommended both not be approved for promotion. (Doc. No. 67 ¶ 26, 28–30, 53). Further, President Oldham found both of their dossiers strong in the teaching and service categories, but not in scholarship. (Doc. No. 56-3 at 98:13–18; Doc. No. 59-5 at 31:1–32:20; Doc. No. 56-3 at 109:5–17; Doc. No. 67 ¶ 39; Doc. Nos. 68-2, 68-15, 68-16). Dr. Loftis had only one published peer-reviewed piece and Dr. Deiter had two. (See id.). Viewing the facts in Dr. Deiter's favor, Dr. Deiter has carried her burden of establishing she was similarly situated to Dr. Loftis in all relevant respects, as she has shown both her and Dr. Loftis were subject to the same TTU promotion policy, had the same ultimate decision-maker as to their promotions, had a similar publication history, and similar feedback on their dossiers at lower levels of review. Gray, 263 F.3d at 599. Accordingly, Dr. Deiter has successfully established the fourth prong of the McDonnel Douglas test and has shown a prima facie case of sex discrimination. Upshaw, 576 F.3d at 585; McDonnell Douglas, 411 U.S. at 802.

### B. Articulated Reason for Adverse Action

Given that Deiter has established a prima facie case of sex discrimination, TTU must articulate a legitimate non-discriminatory reason for promoting Dr. Loftis and Dr. Williams, but failing to promote Dr. Deiter. Upshaw, 576 F.3d at 585; (citing Burdine, 450 U.S. at 252). "This is merely a burden of production, not of persuasion, and it does not involve a credibility

assessment." Upshaw, 576 F.3d at 585 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000)); see also Bd. of Trustees of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 n.2 (1978) (noting that "the employer's burden is satisfied if he simply 'explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons'") (internal citation omitted).

TTU asserts that "Dr. Deiter's application for promotion was denied because Dr. Deiter's dossier fell short of the promotion expectations for awarding full professorship[,]" given Dr. Deiter's "lack of sustained" scholarly output. (Doc. No. 54 at 15–18). TTU contends President Oldham's decision to deny Dr. Deiter's promotion application came from her lack of "consistency" and "quantity" of publication. (Id. at 17). The Court finds TTU has satisfied its burden to articulate a legitimate non-discriminatory reason for not promoting Dr. Deiter. Zandvakili v. Univ. of Cincinnati, 2024 WL 278548, at *7 (6th Cir. Jan. 25, 2024) (affirming district court's determination that plaintiff not "actively publishing in any leading academic journals" was a legitimate, non-discriminatory reason for the employment decision). Dr. Deiter concedes this, as she fails to respond to TTU's argument. (See generally Doc. No. 65).

### C. Pretext

Because TTU has offered a nondiscriminatory reason for not promoting Dr. Deiter, the burden shifts back to her to show that the stated reason is pretextual. "A plaintiff may establish that an employer's stated reason for its employment action was pretextual by showing that the reason (1) had no basis in fact, (2) did not actually motivate the challenged conduct, or (3) is insufficient to explain the challenged conduct." Upshaw, 576 F.3d at 586 (quoting Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994)). "Regardless of which rebuttal method is employed, the plaintiff retains the ultimate burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that

21

the defendants intentionally discriminated against h[er].'" Imwalle v. Reliance Med. Prod., Inc., 515 F.3d 531, 545 (6th Cir. 2008) (quoting Johnson v. Kroger Co., 319 F.3d 858, 866 (6th Cir. 2003)). "Pretext, however, cannot be shown by attacking the decision itself." Hein v. All Am. Plywood Co., 232 F.3d 482, 490 (6th Cir. 2000) (citing Brocklehurst v. PPG Indus., Inc., 123 F.3d 890, 898 (6th Cir. 1997)). In other words, "a plaintiff's subjective interpretations or feelings are insufficient to establish pretext." Rosenthal v. Faygo Beverages, Inc., 701 F. App'x 472, 480 (6th Cir. 2017).

"Whether qualifications evidence will be sufficient to raise a question of fact as to pretext will depend on whether a plaintiff presents other evidence of discrimination." Bender v. Hecht's Dep't Stores, 455 F.3d 612, 626 (6th Cir. 2006). For instance, "[i]n the case in which a plaintiff does provide other probative evidence of discrimination, that evidence, taken together with evidence that the plaintiff was as qualified as or better qualified than the successful applicant, might well result in the plaintiff's claim surviving summary judgment." Id. at 626–27. "On the other hand, in the case in which there is little or no other probative evidence of discrimination, to survive summary judgment the rejected applicant's qualifications must be so significantly better than the successful applicant's qualifications that no reasonable employer would have chosen the latter applicant over the former." Id. at 627.

Dr. Deiter argues her publication record did not actually motivate President Oldham's decision to deny her promotion, given: that President Oldham found her record for promotion to be "strong in other aspects"; her strong research and scholarship record aside from publication; her peer review published scholarship being superior to her male colleagues who were promoted; and the short time frame within which President Oldham considered her application (Doc. No. 65

22

at 21–24).[8]  See Upshaw, 576 F.3d at 586 (quoting Manzer, 29 F.3d at 1084).  TTU does not

directly refute Dr. Deiter's arguments.  Instead, TTU contends that Dr. Deiter has not established

any evidence of discrimination.  (Doc. No. 54 at 18–19).  It asserts that because there is no evidence

of sex-based discrimination, Dr. Deiter must show she was significantly more qualified for

promotion than Dr. Williams or Dr. Loftis to carry her burden to establish pretext, which she

cannot do.  (Doc. No. 54 at 19–21).  The Court agrees with Dr. Deiter.

Dr. Deiter's first piece of evidence, that President Oldham found her record "strong" in

aspects other than her "current level of peer reviewed published scholarship," speaks to potential

sex based biases within the TTU's subjective promotion evaluation process.  (Doc. No. 65 at 21).

It is undisputed that TTU's process for promotion requires a holistic analysis of the faculty

member's dossier.  (See Doc. No. 54 at 19 ("Policy 206 necessitates that President Oldham conduct

a []holistic review of a promotion candidate dossier[.]")).  TTU Policy 206 provides that all faculty

members must engage in teaching, research and scholarship, and service/outreach, "but not all are

expected to engage in each activity to the same degree nor is each individual expected to be

engaged in all aspects of each activity."  (Doc. No. 56-5 at 10).  Various people weigh the strength

of each of these factors for each candidate for promotion, including department peers, the

department chair, dean, Provost, and TTU President.  (Doc. No. 67 ¶ 11; Doc. No. 13 ¶¶ 14, 18).

While the determination as to whether a faculty member has engaged in each of these activities

may be objective, weighing the relative strength of a dossier as a whole is no doubt a subjective

[8] The second method of establishing pretext, that President Oldham's reason for denying Dr. Deiter promotion did not actually motivate the challenged conduct, applies here because Dr. Deiter has admitted the factual basis underlying the decision, i.e., that she only had two peer-reviewed articles published at the time of her promotion.  See Gunn, 632 F. App'x at 844 (under the second approach, "the plaintiff admits the factual basis underlying the discharge") (internal citation omitted).

process.  Subjective evaluation processes, such as this one, "intended to recognize merit provide ready mechanisms for discrimination."  Grano v. Dep't of Development of City of Columbus, 699 F.2d 836, 837 (6th Cir. 1983).  Such circumstances warrant close scrutiny of the articulated reasons for the adverse employment action.  Id.  Viewing all facts in the light most favorable to Dr. Deiter, TTU's subjective evaluation process for promotion to Full Professor, and President Oldham's explicit reliance on only one portion of one factor as the reason for denying Dr. Deiter's promotion application, merits close scrutiny.  Id.

Dr. Deiter contends that President Oldham, the ultimate decision-maker regarding her promotion application, took such little time reviewing her dossier that a reasonable jury could find that TTU's assertion that Dr. Deiter was denied promotion because of her publication record did not actually motivate President Oldham's decision.  See Gunn v. Senior Services of Northern Kentucky, 632 F. App'x 839, 844 (6th Cir. 2015) (in using the second approach to establish pretext, the plaintiff "attacks the employer's explanation 'by showing circumstances which tend to prove an illegal motivation was more likely than that offered by the defendant'") (internal citation omitted).  Viewing the facts in Dr. Deiter's favor, the Court agrees.  The first time President Oldham received her dossier, he recommended it be denied that same day.  (Doc. Nos. 68-17, 56-9).  Yet he took more than two months to review Dr. Loftis's dossier to grant him a promotion.  (Doc. No. 65 at 24–25).  Dr. Deiter explains that "[i]t is not feasible that President Oldham could have engaged in a serious analysis of the contents of [her] dossier, which filled a five-inch binder, in such a short time" (Doc. No. 65 at 24).  See Briggs v. Potter, 463 F.3d 507, 516 (6th Cir. 2006) (irregularities may show pretext where the plaintiff shows they prejudiced him in the selection process or indicate "any dishonesty or bad faith") (internal citation omitted).  Further, the parties do not dispute that President Oldham generally does not review everything in a dossier (Doc. No.

24

56-2 at 45:18–20 (President Oldham, when asked if he reviews everything that is in a dossier, responding: "[g]enerally not"), and that he did not read Dr. Deiter's scholarly work. (Id. at 47:22–24).

These irregularities in the promotion process are alongside others in the record. For instance, the Faculty Affairs Committee determined that Provost Bruce erred twice in reviewing Dr. Deiter's dossier. First, she erred by failing to explain her reason for not recommending Dr. Deiter for promotion in her recommendation letter, as required by TTU Policy 206. (Doc. No. 68-10 at 2; see Doc. No. 68-13). Second, she erred by not notifying Dr. Deiter's unit peers as to why she overturned their recommendation to promote Dr. Deiter. (Doc. No. 68-10 at 2). There is little to no evidence in the record showing that President Oldham considered these procedural errors in his final evaluation of Dr. Deiter's dossier. (See Doc. No. 56-11 at 2). Nor is there evidence showing whether, or to what extent, President Oldham considered the Faculty Affairs Committee unanimously approving Dr. Deiter for promotion. (Id.). These irregularities in the promotion process, taken with the subjective nature of that application process, constitute probative evidence of discrimination. Jenkins v. Nashville Public Radio, 106 F. App'x 991, 995 (6th Cir. 2004); Grano, 699 F.2d at 837.

Having established probative evidence of discrimination, the Court next turns to whether Dr. Deiter has shown she was "as qualified as or better qualified than" Dr. Williams or Dr. Loftis to establish pretext.[9] Bender, 455 F.3d at 626. TTU contends Dr. Deiter cannot show she was

_____

[9] The parties dispute whether Bender applies here, given Dr. Deiter, Dr. Williams and Dr. Loftis were not competing against each other for promotion, as the plaintiff and similarly situated individuals in Bender were. (Doc. No. 54 at 19–21; Doc. No. 69 at 5; Doc. No. 75 at 3). The parties further dispute which articulation of qualifications evidence is applicable if Bender does apply. (See id.). There is some support for applying Bender to cases like this one, where plaintiffs were denied a promotion but were not directly competing with those outside of their class who were promoted. See, e.g., Morris v. Chattanooga Housing Auth., 2008 WL 250544, at *11–12

more qualified than Dr. Williams or Dr. Loftis because: (1) she has not provided evidence of Dr. Williams's and Dr. Loftis's resumes, and the review of each candidate is necessarily holistic; and (2) her qualifications are not "so significantly better" than Dr. Williams's or Dr. Loftis's such that no reasonable employer would have chosen them over her for promotion.  (Doc. No. 54 at 19–21).  But TTU loses sight of its own legitimate, non-discriminatory reason for denying Dr. Deiter's promotion—her "lack of sustained" scholarly output, because TTU believes it lacked "quantity" and "consistency" in publication record.  (Id. at 17).  TTU's briefing is devoid of any argument that Dr. Deiter was denied a promotion to Full Professor after considering her dossier as a whole.[10]  (Doc. No. 54 at 15–18).  And TTU chooses to ignore the evidence Dr. Deiter presents as to pretext that are unrelated to her qualifications.  (See generally Doc. Nos. 54, 69).  Dr. Deiter has presented evidence from which a jury could find that she was as qualified as Dr. Williams and Dr. Loftis with respect to her publication record to establish pretext with qualifications evidence.  Bender, 455 F.3d at 626–27; see Funk v. City of Lansing, Michigan, 821 F. App'x 574, 579–80 (6th Cir. 2020) (plaintiff's pretext arguments are dependent on the legitimate, non-discriminatory reasons

---

(E.D. Tenn. Jan. 28, 2008) (applying Bender where plaintiff was not competing with similarly situated hires for a position).  However, the Court is not aware of, and the parties do not cite to, any Sixth Circuit precedent applying Bender to these factual circumstances.  To resolve this issue, the Court turns to instruction from Chen v. Dow Chemical Co., which in relation to the pretext inquiry states: "[o]ne can distill the [pretext] inquiry into a number of component parts, and it can be useful to do so.  But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination." 580 F.3d 394, 400 n.4 (6th Cir. 2009).  Accordingly, the Court will reference and apply Bender to the extent it is helpful to resolve the pretext question here.

[10] President Oldham's declaration says that he reviews "the totality of the record of the candidate and their overall contributions to their department and TTU" when determining whether to promote a faculty member.  (Doc. No. 70-1 ¶ 18).  TTU claims in its pretext argument that Dr. Williams and Dr. Loftis were promoted "based on the total strength of" their dossiers."  (Doc. No. 54 at 19).  Yet, TTU does not argue that President Oldham's denial of Dr. Deiter's application was due to such considerations in its proffered legitimate, non-discriminatory reason for denying Dr. Deiter promotion.  (Doc. No. 54 at 15–18).  This inconsistency will be resolved by the jury at trial.

26

the defendant proffers as denying plaintiff promotion); Gee v. Liebert Corp., 58 F. App'x 149, 156 (6th Cir. 2003) (same).

Dr. Deiter's equal—and in some respects, better—qualifications than Dr. Williams and Dr. Loftis as to quantity and consistency in publication record are not disputed. Dr. Deiter had published two peer reviewed works as an Associate Professor that qualified for consideration during the application process. (Doc. Nos. 68-2, 68-15, 68-16). Meanwhile, Dr. Williams had only one published peer reviewed work and one accepted for publication, and Dr. Loftis had only published one peer reviewed piece at the time he applied for promotion. (Doc. No. 57-2 at 33:25–34:6; Doc. No. 59-5 at 31:1–32:20). TTU does not argue that Dr. Loftis's publication record was consistent. (Doc. No. 54 at 21). While TTU suggests Dr. Williams's scholarship history was less episodic than Dr. Deiter's, in that he published work every two years from 2013 to 2021 (Doc. No. 54 at 20–21), TTU admits only two of those works were considered during the promotion process. (Id.; Doc. No. 69 at 5). These undisputed facts, taken in the light most favorable to Dr. Deiter, call into question whether President Oldham's assertion that he denied Dr. Deiter promotion because of her inconsistent and limited publication record was true. Gunn, 632 F.3d at 844.

Ultimately, "[p]retext is a commonsense inquiry: did the employer [not promote] the employee for the stated reason or not?" Chen, 580 F.3d at 400 n.4. Chen states:

> This inquiry requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. . . [A]t bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. . . At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.

Id. Dr. Deiter has met her burden of presenting evidence that President Oldham's reason for denying her promotion application may have been pretextual. Upshaw, 576 F.3d at 584. Dr. Deiter has provided evidence of irregularities in the application and review process, which, as

27

noted, is subjective. She has also presented evidence of her equal to or better publication qualifications than Dr. Loftis and Dr. Williams. Further, the record reflects that President Oldham did not give or gave little weight to the procedural errors in Provost Bruce's review of Dr. Deiter's dossier. The record also reflects the same is true as to the Faculty Affairs Committee's unanimous recommendation to promote Dr. Deiter. If such evidence is believed by the trier of fact, it could lead to the conclusion that Dr. Deiter's publication record did not actually motivate President Oldham, the ultimate decision-maker as to her promotion, to deny her application.[11]  See Jenkins, 106 F. App'x at 995 (reversing lower court's grant of summary judgment; in addition to evidence of superior qualifications, the plaintiff provided evidence of "irregularities in the application and selection process," "inconsistencies in the reasons given ... for not hiring her," and "the lack of African–American women in supervisory positions" at the company); Upshaw, 576 F.3d at 586; see also Chen, 580 F.3d at 400 n.4 ("At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.").

At the summary judgment stage, "that evidence must be viewed in the light most favorable to [Dr. Deiter], and viewed in that light," the Court concludes Dr. Deiter has provided evidence such that a jury could reasonably doubt whether President Oldham's reason for denying Dr. Deiter's request for promotion, her lack of "sustained scholarly output," was pretextual. Jenkins, 106 F. App'x at 995; see Singfield v. Akron Metro. Housing Auth., 389 F.3d 555, 564

---

[11] Dr. Deiter contends her sustained and significant accomplishments in research and scholarship also show President Oldham's reason for denying her application is not what actually motivated him in doing so. Although the Court is not convinced these subjective evaluations of her own qualifications may serve as a basis to establish pretext, it need not decide this issue here, where TTU does not dispute that Dr. Deiter lacked these qualifications and does not assert their insufficiency was President Oldham's reason for denying her promotion application. Rosenthal, 701 F. App'x at 480.

(6th Cir. 2004) ("caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference" of discrimination, noting that "an employer's true motivations are particularly difficult to ascertain").  Because Dr. Deiter has established pretext, the Court need not consider the parties' other pretext arguments further.  (See Doc. No. 65 at 20–24). Accordingly, TTU has failed to establish it is entitled to summary judgment on the merits.

## IV.    CONCLUSION

For the foregoing reasons, TTU's Motion for Summary Judgment (Doc. No. 53) will be denied.

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

29